Filed 7/8/22 P. v. Martinez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALBERTO MARTINEZ,<br><br>Defendant and Appellant. | C093036<br><br>(Super. Ct. No. STK-CR-FE-2019-0008927) |

A jury found defendant Alberto Martinez guilty of sex offenses committed against a family member. On appeal, he argues the trial court and defense counsel allowed a biased juror to sit in judgment against him and the trial court erred in admitting evidence regarding child sexual abuse accommodation syndrome. Defendant contends that these errors individually and cumulatively deprived him of his right to a fair trial. We disagree and affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Given the nature of the instant appeal, we briefly summarize the facts supporting the conviction. We will expand upon facts necessary for the resolution of each issue as we address them.

In 2020, a second amended information charged defendant with one count of continuous sexual abuse of a child (Pen. Code, § 288.5, subd. (a))[1] (count 1) and three counts of lewd acts on a child under the age of 14 years (§ 288, subd. (a)) (counts 2, 3 & 4). The crimes were alleged to have occurred generally between 2005 and 2007 and were based on kissing, contact with J.E.'s vagina and J.E.'s contact with defendant's penis.

Defendant, J.E.'s mother, their child Y.E., and J.E. lived together until 2018, although the parents divorced in 2014. Defendant held himself out to be J.E.'s father. When J.E. was in high school, she found out defendant was her stepfather.

In May of 2019, J.E. was about to graduate from college. A few days prior to graduation, she spoke with Ines Ruiz-Huston, the university's director of intercultural student success, about her academic progress. During the conversation, J.E. disclosed that when she was younger, her stepfather inappropriately touched her and made her watch "videos." J.E. said that she decided to report the conduct at that time because she had safety concerns and did not want anyone else to have that experience. As a mandated reporter, Ruiz-Huston told J.E. that they needed to share the information with the university's Title IX coordinator, Elizabeth Trayner.[2]

That same day, Ruiz-Huston and J.E. spoke with Trayner in Trayner's office. Trayner testified that during this meeting, J.E. "disclosed the sexual conduct of her

---

[1] Undesignated statutory references are to the Penal Code.

[2] Title IX refers to a federal law that protects students from sexual harassment in educational programs that receive federal funding. (34 C.F.R. § 106; 20 U.S.C § 1681 et seq.)

father." Trayner told J.E. she would have to report the incident to police and that she could do so directly, or J.E. could be part of the process. J.E. said she preferred to be part of the process. At J.E.'s request, Trayner accompanied her to speak to the police on two occasions. Trayner testified that no one was aggressive with J.E. during the meetings, and that she tried to keep the mood light with laughter.

On May 9, 2019, J.E. and Trayner met with Detective Gilley. J.E. participated in a recorded interview; the statement was played for the jury and was accompanied by a transcript. J.E. stated that when she was around eight years old, defendant came into the room she shared with her stepsister and kissed her with an open mouth "for like a long time" and J.E. could feel his tongue. J.E. said the kissing happened "pretty often." One night, when J.E. was around nine years old, she slept in the same bed as defendant while her mother cared for her sick sister. She woke up and found defendant touching her vagina under her clothes. She shifted position and defendant stopped touching her. J.E. went back to sleep. J.E. also said that during that same year, she and defendant were watching television. Defendant touched her thigh and at some point, J.E.'s mouth was on his penis. Defendant ejaculated and told J.E. "don't worry, it's just milk." J.E. also reported that defendant asked if she would watch a movie with nudity with him, which she later realized was pornography. She told defendant that she did not want to watch that with him, and he turned it off. When she was around 10 years old, she searched on the Internet whether it was okay for a father to touch a child in the manner she experienced and found information that led her to believe it was allowed.

In 2013, J.E. learned that defendant was not her biological father. In response, J.E. told her mother about the incidents with defendant. According to J.E., her mother confronted defendant and asked whether the accusations were true; defendant said yes. Two days later, J.E. learned the family would remain intact but she would be able to decorate her own room to her liking. A year later, her mother and defendant divorced. The family continued to live together and go to family functions together after the

3

divorce, but her mother, J.E. and Y.E. moved out in 2018. J.E. explained that she waited this long to say anything about the encounters with defendant because she "healed" and "forgave" and can now speak out. She was also concerned for the safety of her sister.

On May 10, 2019, J.E. participated in a pretext call where she attempted to elicit an admission from defendant. Defendant was working during the call; J.E. spoke in English and defendant spoke in Spanish. The recording of this call was played for the jury and the prosecution supplied the jury with a transcript, with a translation from Spanish to English. In the call, J.E. asked defendant whether he was sorry for what he did to her when she was little, specifically, "like the day that we were in the guest room and, you know, I was laying down and -- [¶] . . . [¶] -- you had, I had my mouth like on your penis and then your sperm came out and I asked you what that was and you said that it was milk." Defendant responded, "Uh-huh." Defendant then said, "at that time I sincerely asked for God's forgiveness, firstly, right? Of course, first I asked for yours." J.E. asked why he did that to her and defendant responded, "Because of foolishness, [J.E.] I mean, it's something that I have regretted so much . . . ." Defendant also said he did not remember asking J.E. to watch a pornographic movie with him and that he did not think about that anymore because it hurt him. J.E. asked about the time they slept in the same bed and she woke up to defendant touching her vagina. Defendant expressed some confusion as to when that happened. Defendant then said that he knew she was "focused on that time" and encouraged her to seek comfort in her religious beliefs. He also said "I've done 999 good things with you and one bad one. Unfortunately, the bad one was -- it was bad, I mean it was -- very, very, very, very bad." Defendant later said, "It was a foolish thing, it was a male urge," "I don't want to excuse myself. But it's a male flesh but that helped me to not see you that way . . . I have never had those experiences, you understand, those issues."

4

A few weeks after the pretext call, J.E. e-mailed Trayner and told Trayner she did not want to be part of the case. Upon the advice of university counsel, Trayner did not forward that e-mail to Detective Gilley or do anything further.

At trial, J.E. recanted her accusations of abuse. She testified that she went to meet with Ruiz-Huston in May because she wanted to let her know that she would graduate from college. J.E. denied telling Ruiz-Huston or Trayner that defendant sexually abused her, but when she ended up at the police station, J.E. planned to make false allegations against defendant to the detective. She explained she was angry when she learned that defendant was not her biological father. According to J.E., defendant was "like a puppet" whom she could manipulate. J.E. further explained she purposefully called defendant while he was working because she knew it would be hard for him to meaningfully respond. She testified that she never had sexual interactions with defendant, including kissing, oral copulation, or genital touching.

J.E. could not remember talking to the detective about any abuse that occurred when she was eight. She acknowledged that her voice was on a recorded interview and acknowledged she made the statements in the interview. J.E. testified she did not want to conduct a pretext call, but she did so because Detective Gilley "made" her; Trayner "degrad[ed]" her, and both Trayner and Gilley were hostile during the meeting when the call was made. J.E. testified that she told Gilley the accusations were false before she made the call. Gilley testified however, that she did not express any intention during this meeting to retract her prior accusations against defendant but, over five months later in October 2019, she indicated the accusations were false.

J.E. was confronted with prior testimony from the preliminary hearing in which she said defendant helped co-sign her car loan and was going to help with her student loans.

Several family members and friends testified on defendant's behalf and opined he did not have the characteristics of a child molester. They all testified to having a long-

5

term relationship with defendant, during which time defendant proved to be responsible, hard-working, honest, caring, and fatherly with a good character within the community. Defendant was never inappropriate with the witnesses or their respective family members.

J.E.'s mother testified that she was married to defendant for 10 years and had children Y.E. and J.E. Defendant is not J.E.'s biological father, but J.E. only found that out when she was 14 years old, sometime in 2012 or 2013. J.E.'s mother initially testified that J.E. did not make the sexual abuse accusation at the time she found out that defendant was not her father. She admitted, though, that she told a defense investigator that the allegation of sexual abuse came close in time to when she told J.E. that defendant was not her biological father. J.E. told her that the accusations were false.

After the close of evidence, the prosecution dismissed count 1 in the interest of justice. The jury found defendant guilty of counts 2 through 4.

The court sentenced defendant to a term of five years in state prison. The court found that the acts underlying all three counts were separate and distinct. The court imposed the low term of three years in state prison for count 2; a consecutive two-year term (one-third the midterm) for count 3; and a concurrent term of three years for count 4.

Defendant timely appealed.[3]

## DISCUSSION

### I

### *Juror Bias*

Defendant contends several errors occurred resulting in a biased jury and a fundamentally unfair trial. First, he contends that voir dire was improperly conducted as

---

[3] This case was fully briefed and assigned to this panel on March 30, 2022.

the failure to use a questionnaire and inadequate in-person questioning did not explore the prospective jurors' biases. Defendant argues that when Juror No. 8 announced in open court that the case was troubling him because his son was abused as a child, the trial court abused its discretion by failing to properly inquire into this disclosure and ultimately discharge said juror. Because Juror No. 8 demonstrated actual bias, defendant argues, his continued presence on the jury tainted deliberations such that we should not be confident in the outcome of the trial. In addition to faulting the trial court for these errors, defendant asserts defense counsel provided ineffective assistance in failing to properly address these issues. We reject these claims.

During jury selection, the court asked all potential jurors whether there was any reason they could not be fair to both sides in this case.[4] Several potential jurors, including one interviewed after Juror No. 8, volunteered that it would be difficult because of past life experiences with sexual abuse. The trial court excused those who answered they could not be fair. Defense counsel excused one prospective juror who said it could be difficult to be fair to both sides, because both of his daughters were abused by a family member, but that he would try. That same prospective juror also reported other experiences with crime, including the theft of an ATM card by a family member. Defense counsel also excused one prospective juror who commented that it was "such a heinous crime" that he would tend to believe the child, but he would do his best to be fair. That prospective juror also indicated that a person may recant due to family or cultural pressure.

In addition, the prosecutor and defense counsel also specifically asked the potential jurors whether anyone had any bias resulting from sexually related behavior, either in their own life or from information presented in public forums. At one point, the

---

**4** Although the record reflects that the use of jury questionnaires was contemplated, it does not appear they were used.

7

prosecutor told the prospective jurors that if they had something to say, jury selection was the time to speak up. Juror No. 8 told the court that there was nothing preventing him from being fair to both sides.

Possible bias regarding experiences with other crimes and law enforcement was discussed as well. The prosecutor dismissed two prospective jurors who indicated most intrafamilial crimes should not involve law enforcement, if at all possible.

After the jury was sworn in, the court instructed: "You must not let bias, sympathy, prejudice or public opinion influence your assessment of the evidence or your decision. Many people have assumptions and biases about or stereotypes of other people and may be unaware of them." The court warned that the jury must not be biased in favor of or against any party.

On the third day of trial, following J.E.'s testimony and the introduction of the recorded interview, the following exchange took place:

"JN08: Before we continue with this, I want to say to the court, this affect me a lot, but I have this behind me, but my son was sexual abused when he was nine.

"THE COURT: All right. Let's wait a second. What I'm going to do is talk to the juror -- well, nunc pro tunc, we're back on the record. All parties are present. [¶] All right. I want to talk to the juror. Could all the other jurors please step outside.

"(The following proceedings were had with TJ08, OUTSIDE THE PRESENCE OF THE OTHER JURORS.)

"THE COURT: We are back on the record. Both attorneys are present. The defendant is present. The jurors are not present, except for juror number eight, [TJ08]. [¶] You're [TJ08], correct?

"TJ08: [TJ08].

"THE COURT: What did you want to say, [TJ08]?

"TJ08: That this is very hard for me to continue. Because, like I said, when my son was nine, ten years old, he was sexually abused. As well as this person tried to abuse

8

my wife and my daughter. One of my daughters. And, you know, mentally, I thought that I had this behind me, but it's not, it's affecting me a lot.

"THE COURT: How long ago did that happen?

"TJ08: That was, as I say, my son is 42 years old already. But this happened when he was around nine, ten.

"THE COURT: Now he is how old?

"TJ08: Forty-two.

"THE COURT: Forty-two? So that was about 30 years -- 30 years or so.

"TJ08: Thirty years, thirty-two.

"THE COURT: So as a result of hearing the testimony, this has brought back memories?

"TJ08: Yes. Absolutely.

"THE COURT: Now you're the only person that knows the answer to this. Would you be able to set those memories aside and make a decision based just on the evidence in this case?

"TJ08: That's what I thought at the beginning, but it's -- it's hard.

"THE COURT: A case like this is hard for anyone. It's -- the testimony is obviously difficult. Would you be able to handle it? Would you like to -- would you like to sit through the testimony today and, when we break for the weekend on Tuesday, let me know if you can handle it or not? Do you think maybe a weekend will give you a chance to clear your mind and see if you can -- you'd be okay?

"TJ08: We can give it a try, but --

"THE COURT: Okay. All right.

"TJ08: Last night, I wasn't able to sleep well. I woke up at 2:30 in the morning. And with everything in my mind.

"THE COURT: Well, all right. What you can do is sit through it today then and it will -- we'll recess. We'll be out of -- out of -- we will not be in session Saturday,

9

Sunday, Monday. Hopefully that will give a chance to relax, clear your mind, and see if you're okay. And if you're able to handle it and you tell me you can handle it on Tuesday, that would be great. If not -- and you'll be the only person who knows whether you can handle it or not. If not, on Tuesday, then we'll probably release you. So is that -- is that agreeable?

"TJ08: Yes, it is.

"THE COURT: Okay.

"TJ08: Brings me bad memories.

"THE COURT: Yes.

"TJ08: Bad.

"THE COURT: I understand. And it's perfectly understandable. I'm just hoping that you'll be able to proceed as a juror next week and today. So what we'll do is hold on to you for now. And if there's a problem Tuesday, please let me know. Okay.

"TJ08: (Affirmative nod).

"THE COURT: Thank you. [¶] And also, I'll instruct you not to mention this discussion with the other jurors.

"TJ08: Yeah. Maybe I made a mistake by saying anything.

"THE COURT: That's fine. No problem. Thank you. [¶] We can bring the rest of the jurors in.

"(The following proceedings were had IN THE PRESENCE OF THE JURY:)

"THE COURT: Good morning, ladies and gentlemen. We're back on the record. All parties are present again. [¶] I will instruct the jurors to disregard the comments that the other juror made. Don't let that affect your decision in this case in any way."

"A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors" and a conviction cannot stand if a single juror has been improperly influenced. (*People v. Nesler* (1997) 16 Cal.4th 561, 578 [lead opn. of George, C.J.]; U.S. Const., 6th & 14th Amends.; Cal. Const., art I, § 16; *People v. Hensley* (2014)

10

59 Cal.4th 788, 824.) An impartial juror is someone " 'capable and willing to decide the case solely on the evidence' " presented at trial, whereas a juror laboring under actual bias means that juror possesses a state of mind, in reference to the case or the parties, which would prevent him or her from acting with entire impartiality and without prejudice to any party's substantial rights. (*Nesler*, at p. 581; *People v. Romero* (2017) 14 Cal.App.5th 774, 780.)

One of the purposes of voir dire is to expose the prospective jurors' possible biases, who can then be excused for cause if bias is demonstrated or excused through a peremptory challenge. (*In re Hitchings* (1993) 6 Cal.4th 97, 110-111.) There is no constitutional right to voir dire per se or to conduct voir dire in a particular manner. The goal of voir dire is to implement the defendant's Sixth Amendment right to an impartial jury. In conducting voir dire, the trial court has wide latitude to decide: the questions to be asked, the manner in which the questioning occurs, and to contain voir dire within reasonable limits. (*People v. Landry* (2016) 2 Cal.5th 52, 83.) "Thus, ' " 'content' questions," even ones that might be helpful, are not constitutionally required. [Citation.] To be an abuse of discretion, the trial court's failure to ask questions "must render the defendant's trial fundamentally unfair." [Citation.] "Such discretion is abused 'if the questioning is not reasonably sufficient to test the jury for bias or partiality.' " ' " (*Ibid.*) The entire voir dire must be considered in determining whether it was adequate. (*People v. Holt* (1997) 15 Cal.4th 619, 661.)

A trial court may discharge a juror for good cause at any time if it finds the juror is unable to perform his or her duties. (§ 1089; *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 69 (*Allen*); *People v. Lomax* (2010) 49 Cal.4th 530, 588 (*Lomax*); *People v. Romero, supra*, 14 Cal.App.5th at p. 781.) When a court is apprised of information which, if proven true, would constitute good cause for a juror's removal, it must conduct whatever inquiry is reasonably necessary to determine whether the juror should be discharged. (*Allen*, at p. 69; *Lomax*, at p. 588; *People v. Young* (2017) 17 Cal.App.5th

11

451, 463-464.)  Whether and how to hold such a hearing is a matter within the court's discretion, as is the ultimate decision whether to discharge or retain a sitting juror. (*Allen*, at p. 69; *People v. Holloway* (2004) 33 Cal.4th 96, 124-125 (*Holloway*); *Lomax*, at p. 589; *Romero*, at p. 781.)

However, to support a decision to discharge a juror, a " 'somewhat stronger showing' than is typical for abuse of discretion review must be made to support such decisions on appeal.  [Citations.] . . . [T]he basis for a juror's disqualification must appear on the record as a 'demonstrable reality.'  This standard involves 'a more comprehensive and less deferential review' than simply determining whether any substantial evidence in the record supports the trial court's decision.  [Citation.]  It must appear 'that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established.'  [Citation.]" (*Lomax, supra*, 49 Cal.4th at p. 589; see *Allen, supra*, 53 Cal.4th at p. 71; *Holloway, supra*, 33 Cal.4th at pp. 124-125; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)  Conversely, where substantial evidence supports a trial court's conclusion that a juror is able to serve impartially, and no inability to do so appears as a demonstrable reality in the record, the court's failure to discharge the juror is not an abuse of discretion.  (*Holloway*, at p. 126.)

We first conclude that defendant forfeited these challenges by failing to otherwise object to the court's course of action or seek the juror's removal.  (*Holloway, supra*, 33 Cal.4th at pp. 123-124.)  Such an objection was necessary to allow the trial court the opportunity to address the concern and cure any error.  (*Id*. at p. 124; see generally *People v. Young, supra*, 17 Cal.App.5th at p. 461.)

Nevertheless, we reach the merits of defendant's claims because we are naturally required do so to analyze his claim that his counsel's failure to properly object and attempt to appropriately address the issues, constituted ineffective assistance of counsel. (See *People v. Romero and Self* (2015) 62 Cal.4th 1, 44 ["In an appropriate case, a forfeited claim of juror bias can be asserted on appeal under the rubric of ineffective

12

assistance of counsel"].) In addressing the merits, we reject defendant's argument that his trial was structurally flawed. As discussed below, we also disagree that counsel provided ineffective assistance in failing to properly ensure voir dire and the inquiry into Juror No. 8's concerns were properly conducted.

### A. *Voir Dire*

Defendant argues that voir dire was inadequate to explore subconscious and/or potential biases because the court never asked whether the potential jurors or their families had been a victim of sexual assault or child molestation, either through a questionnaire or in-person inquiries and because the trial court did not follow the script recommended by the Judicial Council in the California Standards of Judicial Administration (Standards). He claims Juror No. 8's late disclosure of his history with dealing with the sexual abuse of his son demonstrates the inadequacy of voir dire. We disagree.

A review of the entire voir dire demonstrates the prospective jurors understood that the questions posed during voir dire sought to explore the possibility of bias as a result of life experiences, particularly with sexual offenses. After explaining this case involved allegations of sexual abuse of a child, the trial court asked the prospective jurors whether there was any reason they could not be fair to both sides in this case. Several prospective jurors spoke up and said they could not be fair, some of whom specifically admitted bias as a result of experiences with sexually related offenses. In the first panel of prospective jurors, one person stated that she had quite a few close family members who were victims of sexual abuse and she could not be fair because of those experiences. The trial court excused that prospective juror. Critically, this potential juror was the second person to be interviewed after Juror No. 8, which reasonably would have prompted Juror No. 8 to declare any such biases if he had one.

Contrary to what defendant implies, a trial court's decision declining to use the Standards verbatim does not necessarily result in a failure to expose prospective jurors

13

who are biased or unable to follow the law. (*People v. Contreras* (2013) 58 Cal.4th 123, 145.) In a similar vein, although the prudent use of jury questionnaires can be a valuable addition to the voir dire process, a face-to-face assessment of the sincerity and understanding of a prospective juror is important and sometimes preferable. (*People v. Wilson* (2008) 44 Cal.4th 758, 789-790.) In addition, both parties were free to inquire into the potential biases of each prospective juror without apparent restriction by the trial court. Defense counsel took full advantage of the opportunity to probe for hidden bias and to explore any other factor bearing on juror impartiality. (See *Contreras*, at p. 144 [rejecting a claim of error based on the court's failure to conduct additional voir dire on certain issues when counsel meaningfully participated in the process].) The goal of voir dire was met in this case where all the jurors, including Juror No. 8, had the opportunity and the prodding to reflect on biases stemming from experiences with sexual assault or abuse. Based on a review of the entire voir dire, we cannot say the questioning was not reasonably sufficient to test the jury for bias or partiality such that defendant's trial was fundamentally unfair. (*People v. Holt, supra*, 15 Cal.4th at p. 661.)

### B. *Juror No. 8*

Juror No. 8's response that there was no reason he could not be fair to both sides demonstrates his initial belief but, after hearing part of the evidence, he began to doubt his comfort level with deciding the case. Defendant argues that when Juror No. 8 finally spoke up about his history with sexual abuse in his family, the trial court inadequately inquired into the source of Juror No. 8's potential bias. According to defendant, Juror No. 8 struggled to assure the court he could remain fair and never affirmed that he could set aside his internal struggles to judge the case solely on the evidence, which demonstrated good cause to remove Juror No. 8. Defendant asserts that instead of removing Juror No. 8 as required, the trial court put the matter off until the following week, but never followed up on the matter. The People respond that Juror No. 8's answers were equivocal and did not rise to the level of good cause for discharge.

14

It is true that Juror No. 8 expressed concerns over continuing his jury duty because this case was bringing up a lot of bad memories involving the abuse of his son, which happened over 30 years prior. Contrary to defendant's argument, the mere fact that Juror No. 8 expressed concerns early in the trial did not mean Juror No. 8 failed to disclose a known bias or require that he be immediately discharged. What we require is that each juror maintain an open mind and consider all the evidence before coming to a final determination. (*Allen, supra*, 53 Cal.4th at p. 75.) Juror No. 8's disclosure that it would be hard for him to continue was ambiguous and insufficient to support discharging a juror. (See *Id.* at p. 72 [dismissal was improper where juror's statement suggesting that he prejudged the case was "not entirely clear"].)

We also disagree that the instant case presents "similar circumstances" as those that warranted a reversal in *People v. Castorena* (1996) 47 Cal.App.4th 1051. In *Castorena*, the trial court abused its discretion in failing to conduct an inquiry into the allegations of juror misconduct following its receipt of a 15-page document that contained new information bearing upon and contradicting earlier allegations of misconduct on the part of the same juror and raising new allegations of juror misconduct on the part of a different juror. The appellate court concluded that "[a]bsent such inquiry, the court did not have the requisite facts upon which to decide whether [a removed juror] in fact failed to carry out her duty as a juror to deliberate or whether the jury's inability to reach a verdict was due, instead, simply to [the removed juror's] legitimate disagreement with the other jurors." (*Id.* at p. 1066.)

The court inquired into defendant's disclosure and the record demonstrates that Juror No. 8's concerns did not give rise to good cause for removal. The court asked, "Would you be able to set those memories aside and make a decision based just on the evidence in this case?" Juror No. 8 said that he initially thought he could, "but it's -- it's hard." The trial court agreed that the subject matter was difficult, and anyone would have a hard time with it, but proposed taking the long holiday weekend for self-reflection and

15

the ultimate determination of whether Juror No. 8 could continue to serve on the jury. The court asked, "Would you like to -- would you like to sit through the testimony today and, when we break for the weekend on Tuesday, let me know if you can handle it or not? Do you think maybe a weekend will give you a chance to clear your mind and see if you can -- you'd be okay?" Juror No. 8 said, "We can give it a try" but quickly noted that he had not slept well the night before because of the memories the case has triggered. The court expressed hope that the long weekend would give Juror No. 8 a chance to relax, clear his mind, and see if he was okay to continue serving, but also told Juror No. 8 that he would probably be released if Juror No. 8 could not decide the case on the evidence. The court concluded by saying, "So what we'll do is hold on to you for now. And if there's a problem Tuesday, please let me know." Juror No. 8 agreed.

As the trial court noted, the subject matter at trial was a difficult one; sexual offenses often invoke strong emotions. Yet at no point was the court reluctant to discuss Juror No. 8's concerns and even stated it was prepared to release Juror No. 8 from service if necessary. (Cf. *People v. McNeal* (1979) 90 Cal.App.3d 830, 836 [trial court erred where it was alerted to several comments suggesting juror bias and/or misconduct and inquired into the matter but specifically precluded consideration of "*factual matters*" regarding the basis for the comments].) The court invited Juror No. 8 to explore whether he could separate his memories from the facts of the case, decide the case based solely on the latter and to let the court know on Tuesday if he could not do so. The following Tuesday, neither the trial court nor the parties revisited the issue on the record. More importantly in our review however, after the long weekend, Juror No. 8 did not report to the court that he was unable to judge the merits of the case on the evidence presented or request to be discharged and instead continued his jury service. (Cf. *People v. Delamora* (1996) 48 Cal.App.4th 1850, 1855-1856 [record did not support discharge of jurors who, among other factors, never requested discharge or said they could not continue].) As the court told Juror No. 8 that only he would know his ability to follow the directive to be

16

fair to both sides and that he would be released if he could not do so, it was reasonable to interpret Juror No. 8's silence following the long weekend as Juror No. 8's ability to remain without influence from his past. Overall, based on the court's conversation with Juror No. 8, the trial court could reasonably conclude Juror No. 8 followed its advice to take the weekend to relax and clear his mind before determining whether he could set his memories aside and make a decision based solely on the evidence in this case. Accordingly, there is no "demonstrable reality" that Juror No. 8 was unable to perform his duty as a juror.

On this basis, we distinguish the cases relied upon by defendant. In *People v. Hecker* (1990) 219 Cal.App.3d 1238, both parties and the trial court questioned a juror about having seen the defendant at her church during the course of the trial, but the juror was never able to give any assurance that she could continue to be impartial. The appellate court concluded that this constituted a "demonstrable reality" that she could not remain impartial. (*Id.* at pp. 1244-1245, disapproved on other grounds in *People v. Soto* (2011) 51 Cal.4th 229, 248.) In *People v Collins* (1976) 17 Cal.3d 687, the court held an extensive hearing in which a juror steadfastly maintained that she could not follow the court's instructions, that she had been upset throughout the trial and that she wanted to be excused. The court concluded that this clearly justified a conclusion that the juror could not perform her duty and thus established good cause for her discharge. (*Id.* at p. 696, superseded by statute on another ground as stated in *People v. Boyette* (2002) 29 Cal.4th 381, 462, fn. 19.) In contrast, under the circumstances present here, Juror No. 8's silence after the long weekend was reasonably interpreted as an affirmation that he could remain impartial. There is no "demonstrable reality" that Juror No. 8 was unable to perform the functions of a juror and this court must not presume the worst. (See *People v. Franklin* (1976) 56 Cal.App.3d 18, 25-26 [no abuse of discretion in failing to remove a juror whose comments did not reach the required standard of an inability to perform the functions of a juror but showed she was intelligently sensitive to the effect that her

17

personal experience may have on the case, and indicated her desire to serve and render a fair decision].)

Indeed, there was no indication that Juror No. 8 subsequently failed to consider the additional evidence introduced at trial or to deliberate. (See *Allen, supra*, 53 Cal.4th at p. 73 [fact that juror did not refuse to listen to all the evidence indicated he had not prejudged the case].) In the absence of further communications from Juror No. 8 or evidence he refused to deliberate or consider the evidence, further inquiry was not required. (See generally *Lomax, supra*, 49 Cal.4th at p. 592 [" 'the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists' "].) On this record, we cannot conclude that the court abused its discretion in the manner of inquiry into Juror No. 8's disclosure of his son's abuse or in failing to remove Juror No. 8 without a "demonstrable reality" that Juror No. 8 was unable to fulfill his function as a juror. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 807 [a juror's inability to perform a juror's functions must be shown by the record to be a "demonstrable reality"; the court will not presume bias and will uphold the court's exercise of discretion on determining justification for discharging a juror if supported by substantial evidence].)

## C. *Entire Jury Panel*

Contrary to defendant's claim, no further inquiry was required as to whether the jury panel was negatively impacted by Juror No. 8's disclosure in open court. The trial court possesses broad discretion to determine whether possible bias or prejudice against the defendant has contaminated the entire venire to such an extreme that its discharge is required. (*People v. Medina* (1990) 51 Cal.3d 870, 889.) We see no such abuse here. Juror No. 8's comments did not contain any specific information that suggests the entire jury panel would have been prejudiced against defendant. The general topic of a juror's experiences with sexual abuse was a concept familiar to the jury panel as it was discussed

18

in voir dire. As in voir dire, the court took this disclosure seriously. The trial court quickly indicated that the conversation was important and spoke to Juror No. 8 alone. The fact that Juror No. 8 remained on the panel signaled to the jury that the issue was resolved. Any doubt of that was then dispelled when the court instructed the panel to disregard the comments that the other juror made and to not let that affect their decision in the case in any way. Without evidence to the contrary, we presume the jury followed the instruction. (*People v. Anzalone* (2013) 56 Cal.4th 545, 557.)

Finally, contrary to defendant's speculation, there was no indication that Juror No. 8 or anyone on the panel had difficulties deliberating in light of Juror No. 8's disclosure. Discharging the entire venire is a remedy that should be reserved for the most serious occasions of demonstrated bias or prejudice. (*People v. Medina, supra*, 51 Cal.3d at p. 889.) The present case falls short of that mark. We conclude the trial court did not err in declining to discharge the entire venire. (See *People v. Nguyen* (1994) 23 Cal.App.4th 32, 40-41 [no abuse of discretion in failing to dismiss entire jury panel when there was no evidence the panel was prejudiced by a prospective juror's statement that he might fear retaliation for his jury service since he belonged to the same ethnic community as the defendant but also said he would be able to serve as a fair and impartial juror].)

Defendant also argues he was provided ineffective assistance by his counsel who failed to ensure defendant had a meaningful and adequate voir dire and failed to object to the continued inclusion of Juror No. 8 on the panel. To establish ineffective assistance of counsel, a defendant must show counsel's efforts fell below an objective standard of reasonableness and resulted in prejudice. (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*); *Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [a defendant claiming ineffective assistance of counsel must establish both error and prejudice].) "If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether

19

counsel's performance was deficient." (*People v. Sapp* (2003) 31 Cal.4th 240, 263.) Because we conclude that the trial court did not abuse its discretion in voir dire in general or in specifically handling Juror No. 8's disclosed concern, defendant was not prejudiced by the continued presence of Juror No. 8 on the jury, and we reject his alternative contentions that his trial was structurally infirm or that his counsel provided ineffective assistance by failing to challenge for cause the juror in a timely fashion.

## II

### *CSAAS Testimony*

Prior to trial, defendant sought to exclude or limit the introduction of evidence of child sexual abuse accommodation syndrome (CSAAS). After a hearing on the matter, the trial court indicated it would admit the evidence for the purpose of dispelling misconceptions about child abuse. Prospective jurors were subsequently asked about their life experiences with sex offenses and thoughts about why a person would recant allegations of abuse. Several prospective jurors were excused based on their answers to these inquiries.

Defendant argues that the trial court erred in allowing an expert to testify about CSAAS to dispel any misperceptions or myths as to behavior expected from a child who has been sexually abused. He argues such evidence was irrelevant because public awareness of the reporting dynamics around child sexual abuse has greatly increased since *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), and the jury already demonstrated it understood various reasons as to why a child might recant an abuse allegation. He also argues that CSAAS evidence fails to satisfy established requirements for admissibility and courts in many other jurisdictions have disapproved of the use of CSAAS evidence. Alternatively, he argues that the expert, Dr. Anthony Urquiza, went beyond the scope of permissible evidence by testifying to factors "predictive" of child sex abuse. According to defendant, the prosecutor then capitalized on the expert

20

testimony to argue that J.E. fit the characteristics of CSAAS, thereby introducing the impermissible inference that J.E. really was abused. We disagree.

Prior to trial, defendant sought to exclude the use of CSAAS evidence. Defendant argued that such evidence was not relevant because it was unlikely society still believed any of the myths surrounding child abuse reporting and recantation. Defendant also sought to exclude testimony regarding the characteristics and conduct typical of child sex offenders and the percentage of child sex abuse allegations that are false. Defendant argued that if CSAAS evidence was admitted, the prosecution should be held to the evidentiary limitations as set forth in the analogous case of *People v. Bledsoe* (1984) 36 Cal.3d 236, 251 in which the court held rape trauma syndrome is not admissible to prove the witness was raped. Also of particular concern, defendant argued, the expert should only testify to victims as a class and not about the particular facts of this case. In both her motion and at oral argument, the prosecutor replied that the evidence was offered to show why a victim might act a certain way and assured the court that the expert would not opine whether defendant was guilty or whether J.E. was really molested. Noting that it had other section 288 trials in which this type of testimony was received, the trial court admitted the evidence.

During voir dire, the prosecutor asked questions about the prospective jurors' beliefs surrounding a victim's retraction of allegations of abuse. Within the context of domestic violence, the prosecutor asked whether the prospective jurors would believe a victim if she recanted in the face of documentation of her injuries reportedly inflicted by her husband. One juror answered that he would not believe the recantation because she could be recanting due to pressure from her husband. Prospective jurors answered, "fear," "family and cultural pressure" and the possibility that the abuse did not happen could influence a person to recant.

At trial, Dr. Urquiza testified that CSAAS does not indicate whether a child was actually sexually abused. It is a theory, based on five components, used to explain a

pattern of characteristics that tend to occur in a population of children who have been sexually abused. The theory is used to train therapists to provide better approaches to treatment and to train jurors so they can render a verdict without influence from myths about sexual abuse.

Dr. Urquiza testified as to the five components that relate to traits or characteristics seen in "most" sex abuse victims and situations: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and recantation. As to secrecy, Dr. Urquiza testified that most sexually abused children are abused by people with whom they have an ongoing relationship. Within this relationship, there is often a power imbalance, and the perpetrator may threaten dire results if the abuse is disclosed. For example, the abused person might be threatened or fear the abuser will go to jail. The perpetrator may also give the child attention, affection, gifts, or money to manipulate them into a relationship where they can be sexually abused. They may also introduce sexually inappropriate movies or show more physical affection to increase the sexual nature of the relationship. Where the perpetrator has more control and power in the relationship, the child may feel helpless to fend off or run away from his or her abuser. Based on the need for secrecy and a helplessness to stop the abuse, the child may feel trapped in the situation. Abused children learn how to cope with internal emotions in order to accommodate the situation in which they are trapped. The child may not appear to be distressed, because they may be disassociating or compartmentalizing the abuse. Dr. Urquiza testified that only about 25 percent of abused children will become emotional when reporting the abuse to authorities. The next component is a "delayed and unconvincing disclosure." According to Dr. Urquiza, it is common for children to fail to disclose an incident of sexual abuse the first time it happens or even after months, years or a lifetime of abuse. Factors leading to this delayed disclosure include shame, a fear of consequences, and genuine love for their abuser. Dr. Urquiza also testified that there is research showing that abusers use strategies to keep children quiet. Finally, Dr. Urquiza

22

testified to retraction and recantation. He said that 20 to 25 percent of children "who have been sexually abused and were able to disclose at some point, after that disclosure, at some point took back the allegation, said, no, it never happened. So they really were abused, but afterwards they said, no, they weren't." He repeated this statistic on cross-examination. According to Dr. Urquiza, the biggest predictor of retraction is if the abuser is a family member because it is more likely the family will pressure the child to retract the accusation. Other reasons include that a child may love the abuser, worry the abuser will harm the child, or that the abuser could go to jail.

On cross-examination, defense counsel explored the area of false accusations. Dr. Urquiza testified that children do make false allegations of sexual abuse. He testified that "the frequency of false allegations of sexual abuse is pretty low." He explained that "the body of knowledge [regarding false accusations] is somewhat limited" so knowledge about reasons why a child might make a false accusation "becomes more tentative." He said that false accusations tend to become a concern when there are marital disputes, child custody battles or when there are mental health issues like psychosis.

Dr. Urquiza testified that the use of CSAAS evidence in court has long been approached with caution, with the understanding that the theory may not be used to make a determination whether somebody was abused.

The prosecutor referenced Dr. Urquiza's testimony during closing arguments. She reminded the jury that Dr. Urquiza testified that more often than not, children are assaulted by someone close to the child. The prosecutor also argued that J.E. had a motive to lie at trial in recanting her accusation due to family pressure to keep the defendant involved in the family and due to defendant's continued financial assistance with her car and student loans. The prosecutor argued that J.E.'s actions, including recanting, were "consistent with someone who has been sexually abused as a child" as J.E. was trying to undo the harm to her family after she "opened this can of worms." The prosecutor reviewed the recorded interview and pretext call with the jurors and reminded

23

them that J.E. spoke to defendant about the fact that it was hard for her to live with him after she disclosed the abuse to her mother and the family remained intact. The prosecutor argued that no one wants to admit abuse in the family but that J.E.'s family chose to keep it a secret and the family is now fighting "to keep things the way they were before." She also argued that defendant's comments in the pretext call regarding all the things he did for her, like Christmas gifts and letting her paint the room, constituted defendant's attempt to make up for what he did to her. "He's buying her things. He's helping her pay for her car, helping her with her tuition, because he feels guilty about the things that he did to her. . . . [¶] And Dr. Urquiza talked about how victims of sexual assault could still feel love for the person that perpetrated the crime against them. Clearly she forgives him. Clearly she cares about him. And that's very confusing because there's also this alternate feeling of shame for the things that he did to her."

In response, defense counsel argued that CSAAS was not a syndrome and is not a diagnostic tool. He reminded the jury that "We had to ask [Dr. Urquiza] about false reporting. And I asked him some questions about that. And he kept sort of hedging and saying, well, it's very low, it's very low, it's very low. But the fact of the matter is they do teach that there is false reporting. Even one false report would be too many. But he's in a world of statistics and this is low so we should just ignore it. Maybe not just ignore it, but it certainly wasn't a high priority on his list of things that he's been doing. So you have to ask yourself, why, why do we have even information about this.

"These certain myths need to be dispelled. No, it's just sort of the icing on the cake in terms of it gives you some -- doctor comes in and starts talking about it. But you have the ability to weigh what the doctor said. You could -- you could reject the things that the doctor said. And you'll see the instruction on that if that's how you decide. And I think it's really important . . . to see it in the context of something that is supposedly some tools for you to use. But in reality, it's -- it's obvious things that people know about all the times, late reporting and all this other kind of thing.

24

"I think the most telling thing about the witness, Dr. Urquiza, is that when he was asked about some peer review journals, peer review articles, the London-Bruck article that was actually not favorable for this -- this type of evidence, and yet it did talk about disclosure. And he seemed more concerned about the fact they didn't mention his -- his articles. And he brings his hands up. And -- and when I asked him about the -- the nature of peer review articles and helping today, he got a bit testy. And I think that said a lot about again this theme: The first story is the golden story. Any other story, we don't have to do any investigation. We don't have to go and follow-up on leads. Especially in the context where at some point in the investigation, Detective Gilley understood that there was a problem in recanting."

Evidence Code section 801, subdivision (a) permits the introduction of testimony by a qualified expert on a subject sufficiently beyond common experience when the opinion would assist the trier of fact. In addition, evidence is generally admissible if it is relevant. (Evid. Code, § 351.) Relevant evidence is that which has a tendency to prove or disprove a disputed fact that is of consequence to the determination of the action, including the credibility of a witness. (Evid. Code, § 210.) A trial court's decision to admit evidence is reviewed for an abuse of discretion. (*People v. Brooks* (2017) 3 Cal.5th 1, 43.) An appellate court cannot reverse a judgment based on the erroneous admission of evidence unless the admitted evidence "resulted in a miscarriage of justice." (Evid. Code, § 353, subd. (b).)

In California, "it has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse." (*In re S.C.* (2006) 138 Cal.App.4th 396, 418; see also *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069 (*Mateo*); *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744; *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956 (*Housley*); *People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394.)

25

Although expert testimony about how child sexual abuse victims commonly react is not admissible to show a child has in fact been sexually abused, it is admissible to show the alleged victim's conduct was not inconsistent with the conduct of someone who has been molested, and also to evaluate the believability of the alleged victim's testimony. (*Patino*, at pp. 1744-1745; *Housley*, at p. 955.) That other jurisdictions have resolved the issue differently also does not compel a contrary result. (*People v. Williams* (1997) 16 Cal.4th 153, 195 [case from a sister state is not controlling].)

At the outset, the People claim that defendant forfeited these arguments. The general rule is that when an in limine ruling admits evidence, the party seeking exclusion must object when the evidence is actually offered to preserve the issue for appeal, although a sufficiently definite and express in limine ruling may also serve to preserve a claim. (*People v. Brown* (2003) 31 Cal.4th 518, 547.) Defendant disagrees that the issues are forfeited in light of the ruling on the motion in limine but argues that to the extent that they are not fully preserved, counsel was ineffective for failing to preserve them. The trial court allowed the evidence with the understanding that it could not be used to prove J.E. was molested or that defendant was the abuser, but that it could be used to explain characteristics of an abused child to explain delay in reporting. This ruling was sufficiently definite and express to preserve some of the issues raised in the in limine motion. Specifically, we conclude defendant's arguments that the evidence was irrelevant and could not be used to determine guilt or victim status are preserved for appeal. Because defense counsel introduced evidence of the likelihood of false allegations and failed to object on the basis of inadmissibility under *Kelly/Frye*,[5] we address those issues within the context of defendant's claim that counsel provided ineffective assistance. We find defendant's claims of errors unpersuasive.

---

[5] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013.

26

Defendant argues that CSAAS evidence was unnecessary to dispel myths because jurors no longer harbor misconceptions around sexual abuse and different factors that impact reporting. Defendant claims that since the inception of CSAAS, a "tidal wave of child sexual abuse, and sexual assault, allegations and revelations has drowned out the misconceptions CSAAS was devised to refute." He maintains that this is demonstrated by the discussion in voir dire, where many prospective jurors expressed insight into why a person might retract their allegation of abuse or assault.

That the public might be more aware that sexual abuse occurs and that victims of sex offenses may delay reporting for a number of reasons does not mean there are no longer misconceptions about child sexual molestation. Nor does the fact that the topic of why a person might retract an allegation of a sex offense was discussed during voir dire mean that the jury was fully educated on the relevant dynamics of child abuse reporting. (See *People v. Lapenias* (2021) 67 Cal.App.5th 162, 172-173 [rejecting a similar claim when the record does not establish that all the empaneled jurors were aware of the entire spectrum of CSAAS evidence (secrecy, helplessness, entrapment, accommodation, and recantation)].) Dr. Urquiza's testimony was relevant to explain faulty assumptions concerning how and when a victim of sexual abuse may come forward about the abuse, and that the failure to immediately report abuse or the retraction of an accusation of abuse are not inconsistent with someone who suffered sexual abuse.

J.E.'s delay in reporting and subsequent retraction of her accusation at trial presented an issue as to her credibility. Dr. Urquiza's testimony was thus relevant to explain that "such normally self-impeaching behavior is not unusual for sexually abused children." (*People v. Munch* (2020) 52 Cal.App.5th 464, 475 (*Munch*); see *McAlpin, supra*, 53 Cal.3d at p. 1300-1301.) He testified that sexually abused children may delay reporting because the perpetrator is an important member of the family and the child fears dire consequences of the report. He also testified that an abused child may retract the accusation because the child may love the abuser, fear the abuser will go to jail, or due to

27

family pressure. That testimony helped dispel any myths the jurors believed regarding recantation as it relates to credibility. It was up to the jury to decide whether Dr. Urquiza's possible alternate explanation for delayed reporting and recantation applied to J.E.'s circumstances. (See *People v. Patino, supra*, 26 Cal.App.4th at pp. 1744-1745 [aspects of CSAAS are as consistent with false testimony as with true testimony; CSAAS is probative and admissible if it is geared toward the child's credibility as opposed the defendant's culpability].)

Defendant also contends CSAAS evidence was inadmissible because it is founded on unreliable principles that are ill-suited for use in a criminal trial. He characterizes such evidence as " 'junk' science," and argues the trial court should have subjected Dr. Urquiza's testimony to *Kelly/Frye* scrutiny. Citing disagreement among academics and cases from other states, defendant argues that CSAAS should be held inadmissible in California because it is no longer accepted in the scientific community and the average person no longer harbors misconceptions about child sexual abuse victims. Defendant acknowledges that this issue was not litigated in the trial court and is subject to forfeiture but asserts that counsel was ineffective for failing to raise the issue below and asserts, notwithstanding legal authority to the contrary, that we should hold that the evidence here failed to satisfy the *Kelly/Frye* test. We are not persuaded by defendant's argument.

*Kelly/Frye* "renders inadmissible evidence derived from a 'new scientific technique' unless the proponent shows [among other things] that . . . 'the technique is generally accepted as reliable in the relevant scientific community.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 315.) " '*Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.' " (*Id.* at p. 316.)

California courts have uniformly held that CSAAS testimony is not subject to *Kelly/Frye* because it does not qualify as "scientific evidence" so long as it is not used to prove the victim was in fact sexually abused. (See, e.g., *People v. Lapenias, supra*,

28

67 Cal.App.5th at p. 173 [finding *Kelly/Frye* did not apply to CSAAS because it was not "new" and because it did not purport to provide a definitive truth, but rather was intended to disabuse jurors of misconceptions they might hold about the conduct of children who have been sexually abused; "expert CSAAS testimony is not ' " 'scientific evidence' " ' "]; *Munch, supra*, 52 Cal.App.5th at pp. 472-473 [CSAAS evidence is not subject to *Kelly/Frye* because it is not new scientific evidence that has not previously been accepted in court]; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Harlan* (1990) 222 Cal.App.3d 439, 448; *People v. Gray* (1986) 187 Cal.App.3d 213, 218-219.) We see no reason to depart from the uniform conclusion reached in those cases that *Kelly/Frye* does not apply to CSAAS evidence. Because established law would make an objection futile, counsel was not ineffective for failing to object to the admissibility of CSAAS evidence on this basis. (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)

Defendant argues that even if the trial court did not err in admitting CSAAS evidence, Dr. Urquiza's testimony went beyond the permissible scope of admissible evidence when he "testified to facts invariably leading jurors to make the leaps" prohibited in *People v. Clotfelter* (2021) 65 Cal.App.5th 30 (*Clotfelter*). He argues that by providing statistics of false accusations and characteristics of "most" sexual abuse victims, he impermissibly provided testimony that "predicted" the: demeanor and characteristics of a sexual assault victim; likelihood that this case involves a false allegation; and reasons why a person would recant. Defendant further claims that the prosecutor capitalized on Dr. Urquiza's testimony to improperly infer that J.E. was a true victim because the circumstances around her report of the abuse were similar to several characteristics of those with CSAAS.

Much of defendant's argument is based on a misplaced reliance on *Clotfelter*. In *Clotfelter*, a routine sex offender compliance check and search of Clotfelter's residence revealed evidence that he had formed relationships with three minor boys (two were

brothers) and their respective families. Clotfelter was charged with, and convicted of, annoying or molesting a child, contacting or communicating with a 14 or 15-year-old child with the intent to commit a sexual offense, and contacting or communicating with a child under the age of 14 with the intent to commit a sexual offense. (*Clotfelter, supra*, 65 Cal.App.5th at pp. 37-38.)

In reviewing the record, the appellate court noted that Clotfelter's intent was the disputed issue in the case. It was undisputed that Clotfelter had developed close connections with the boys and their families; there was a dearth of direct evidence that Clotfelter was sexually inappropriate with the boys. (*Clotfelter, supra*, 65 Cal.App.5th at pp. 60, 64-65.) All of the boys testified that Clotfelter never did anything inappropriate, and the parents of the respective boys also said they saw nothing alarming with Clotfelter's behavior. (*Id*. at pp. 39, 64-65.) Clotfelter testified and explained that after he underwent surgical castration several years prior, he felt a " 'profound change' " and he no longer had the desire to molest a child; he was not sexually attracted to the boys. (*Id*. at p. 48.) A forensic psychiatrist testified for the defense and opined that the castration had "worked" for Clotfelter, he was no longer a danger to the community and no longer had any desire to molest children. (*Ibid*.)

In contrast, the prosecution presented an expert who testified regarding CSAAS and a clinical psychologist (who had evaluated Clotfelter over 10 years prior to his arrest) testified that he previously diagnosed Clotfelter with pedophilia and a personality disorder with narcissistic and antisocial features. (*Clotfelter, supra*, 65 Cal.App.5th at pp. 47-48.) The psychologist opined that a hypothetical person with the exact same history as Clotfelter has "either reoffended or is close to reoffending." (*Id*. at p. 61.) A forensic psychiatrist opined that Clotfelter's pedophilic disorder was specified as " 'exclusive' " as he was attracted to prepubescent boys and that this category of pedophiles has the highest recidivism rate. (*Id*. at pp. 47-48.)

On appeal, the appellate court was troubled by the introduction of all of the expert testimony produced by the prosecution. The court noted that given that the main issue at trial was whether Clotfelter's behavior towards the purported victims was criminal, the fact that a highly credentialed psychiatrist said it was, was unquestionably prejudicial. (*Clotfelter, supra*, 65 Cal.App.5th at p. 60.) The court also concluded that the psychologist's testimony in answering the hypothetical was "equivalent to testifying that Clotfelter had the requisite mental state and was guilty (or about to be guilty) of the charged offenses." (*Id.* at p. 61.) Finally, the court determined that because the case did not involve victims who delayed reporting abuse or a retraction of an accusation, indeed, there was no allegation of abuse, it was not at all apparent that the CSAAS testimony was relevant. (*Id.* at pp. 64-65.) The court stated that "the jury cannot be led to engage in the leap from: (1) many victims of sexual abuse do not disclose the abuse because they hold the abuser in high esteem; (2) the witness failed to disclose the sexual abuse; (3) the witness exhibits the same behavior as a class of actual victims of sexual abuse; therefore, (4) the witness was in fact sexually abused." (*Id.* at p. 64.) Yet the court determined that this is precisely the argument that the prosecutor was making to the jury: that it could use the CSAAS testimony to infer that the boys were actual victims despite the fact that none of them ever disclosed or testified to any inappropriate behavior. (*Ibid.*)

Finding certain expert testimony impermissible, the appellate court concluded that counsel was ineffective for failing to object to, or move to strike, the expert testimony, the improperly used CSAAS evidence and the repeated instances of inflammatory testimony. In light of the lack of direct evidence of sexual impropriety, the court concluded it was reasonably probable that defense counsel's errors taken together affected the outcome of the case and rendered the result of the trial unreliable and fundamentally unfair. (*Clotfelter, supra*, 65 Cal.App.5th at pp. 69-70.)

The instant case is vastly different than *Clotfelter*. Here, J.E. disclosed the abuse to her mother and later to two university employees, then participated in a recorded

interview with the detective. J.E. also participated in a pretext call with defendant in which she asked defendant to answer for incidents of inappropriate conduct, consistent with her recorded interview. Although J.E. later retracted her accusations of abuse and testified on the stand that defendant never abused her, this presented a credibility issue rather than a lack of evidence of criminal behavior as was at issue in *Clotfelter*. Unlike in *Clotfelter*, the use of CSAAS evidence was not used to supply evidence of defendant's mental state or criminal behavior. Defendant's jury was never called upon to infer J.E. was truly molested by defendant based solely on Dr. Urquiza's description of the demeanor or characteristics of most sexual abuse victims, the low statistical likelihood that this was a false allegation, and artificial reasons why a person would recant. Rather, if the jury believed J.E.'s recorded interview and the pretext call, such evidence supported the findings of guilt even without consideration of the CSAAS evidence.

Defendant argues that Dr. Urquiza's predictive testimony regarding the statistical likelihood of recantation and the unlikelihood of false allegations, along with a description of a sex abuse victim's demeanor or characteristics and reasons as to why a person would recant violates the prohibition against introducing evidence that could lead jurors to leap to the conclusion that J.E. was abused because she fit Dr. Urquiza's overall profile. In support of this claim, defendant cites *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*), in which the court concluded that statistical probability evidence in the context of CSAAS improperly invited jurors to presume the defendant was guilty.

We disagree that *Julian* establishes that Dr. Urquiza's testimony about false accusations prejudiced defendant. In *Julian*, the prosecution's expert psychologist testified at length concerning the percentage of false allegations made by children in 12 studies. (*Julian, supra*, 34 Cal.App.5th at p. 883.) He specifically cited a Denver Department of Social Services study that found only 2.5 percent of sexual abuse allegations were false allegations out of 551 cases. (*Ibid*.) He also cited a study of 798 cases in which not a single false allegation was made by a child. (*Id*. at p. 884.) The

32

defense counsel in *Julian* did not object to the expert's statistical evidence. (*Id*. at p. 887.)

The appellate court determined that defense counsel provided ineffective assistance of counsel by not objecting to the statistical evidence. Noting the weak prosecution evidence and comparatively strong defense evidence, the court explained: "[The expert's] statistical evidence tipped the scales in favor of the People based on statistical studies that were irrelevant to the issue of Julian's guilt or innocence. It distracted the jury from its duty to decide the properly admitted evidence. [Citation.] Such evidence may not be prejudicial where it occurs in a slight passing reference by the expert. But here the jury was bombarded with it." (*Julian, supra*, 34 Cal.App.5th at p. 888.)

Unlike the wide-ranging statistical evidence in *Julian*, this case included only minor references to the false child sex abuse allegations, and only after elicited by the defense. Dr. Urquiza characterized false allegations as rare, appearing "infrequently" and accounting for a "small percentage" of sex abuse reports. Dr. Urquiza did not provide any statistical evidence regarding false allegations. The statistic he provided was that 20 to 25 percent of known molestation victims end up retracting the accusation. This statistical evidence is less likely to prompt an impermissible reference because this statistic is prospective only. In other words, from a class of known victims, one may expect 20 to 25 percent of that class to recant. It is not necessarily true that if a person recants, one may infer that person must have been molested. If a person recants an allegation, it is just as likely that it is because the allegation was never true as it is that the allegation was true. Defendant's argument to the contrary is based on the conditional probability fallacy.[6]

---

[6] This is where a conditional probability is equated with its inverse; that is, given two events A and B, the probability of A happening given that B has happened is

Defendant maintains, however, that the prosecutor's use of Dr. Urquiza's testimony to provide the inference that J.E. was molested, was an impermissible use of CSAAS evidence. We do not agree that under the circumstances of this case the prosecutor improperly used CSAAS in closing arguments. In closing, the prosecutor reminded the jury that Dr. Urquiza testified that most child sex abuse is perpetrated by someone close to the victim. She did not invite the jury to conclude that because defendant was a family member, he must have molested J.E. The prosecutor then went through the evidence against defendant, told the jury that Dr. Urquiza's testimony could explain certain aspects of J.E.'s behavior, such as her delay in reporting the abuse to authorities, a concern for remaining an intact family after she disclosed the abuse to her mother, and possible financial and familial pressure to lie on the stand. Because CSAAS evidence is permitted to possibly shed light on such issues of self-impeachment, it was not improper for the prosecutor to apply the evidence to the instant case. Notably, the prosecutor did not mention any of Dr. Urquiza's testimony regarding false allegations of sexual abuse to ask the jury to infer that it was unlikely that the allegation of abuse was false.

Finally, we see no ineffective assistance in allowing statistical or "predictive" evidence to be admitted. As an initial matter, defendant has not shown deficient performance. " 'In determining whether counsel's performance was deficient, we exercise deferential scrutiny. [Citations.] The appellant must affirmatively show counsel's deficiency involved a crucial issue and cannot be explained on the basis of any knowledgeable choice of tactics. [Citation.] [¶] Our Supreme Court recently reiterated the obligations of appellate courts in reviewing claims of ineffective assistance of counsel: " ' "Reviewing courts defer to counsel's reasonable tactical decisions in

_____

assumed to be about the same as the probability of B given A, when there is actually no evidence for this assumption. (Cf. *McDaniel v. Brown* (2010) 558 U.S. 120, 128 [explaining the logical fallacy in the context of DNA evidence].)

examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of professional assistance.' " [Citation.] "[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation]. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." [Citation.]' " [Citation.]' [Citation.]" (*People v. Loza* (2012) 207 Cal.App.4th 332, 351.) The record does not disclose that defense counsel had no rational tactical purpose for eliciting the statistical evidence regarding false allegations. (See *Mai, supra*, 57 Cal.4th at p. 1009 ["a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance"].) Given the strength of the evidence against defendant, defense counsel could have reasonably made the tactical decision to elicit the statistical evidence in an attempt to show that the sexual abuse allegations were false and that the jury should believe J.E.'s testimony that defendant never molested her. While Dr. Urquiza testified it was rare for a child to falsely report sexual abuse, his testimony supported an inference that the accusations of abuse against defendant were false, which was consistent with the defense theory of the case. Further, after eliciting the false allegations evidence in cross-examination, defense counsel was the first to mention it in closing arguments, which strongly suggests a tactical purpose for questioning Dr. Urquiza about false allegations of child sexual abuse.

### III

### *Jury Instruction*

Defendant argues that he was denied a fair trial when the trial court failed to instruct the jury on the proper use of CSAAS testimony. He identifies CALCRIM No. 1193 as providing the appropriate language. He argues that there was no strategic

35

reason for defense counsel to not request this instruction and in failing to do so provided ineffective assistance.

When the parties discussed the admissibility of the CSAAS testimony, both parties indicated that a jury instruction regarding CSAAS would be appropriate. The prosecutor stated that she submitted a limiting instruction for the court stating the testimony by Dr. Urquiza is offered and may be considered only for the limited purpose of understanding and explaining the behavior of the alleged victim and not as proof that the sexual abuse occurred. This was consistent with defense counsel's pretrial request that the jury be " 'instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claims [are] true.' "

During the conference regarding jury instructions, defense counsel offered CALCRIM Nos. 332 and 333 as instructions "in line with my motions in limine."

The trial court instructed the jury that it alone must decide what the facts are based on the evidence presented, it was the sole judge of the credibility or believability of the witnesses (CALCRIM Nos. 200, 226), and that it must determine the meaning and importance of Dr. Urquiza's expert testimony (CALCRIM No. 332). The jury was further instructed that if Dr. Urquiza was asked to give opinions based on assumed facts posed in hypothetical questions, it was up to the jury to decide whether any assumed fact had been proved, and that, if it concluded an assumed fact was not true, it must consider the effect of the expert's reliance on that fact in evaluating his opinion (CALCRIM No. 332). Finally, the court instructed the jury that in evaluating the opinions of witnesses not testifying as an expert, it was not required to accept the opinions as true or correct and it may disregard all or any part of an opinion that it found unbelievable, unreasonable, or unsupported by the evidence (CALCRIM No. 333).

Defendant argues the trial court erred in failing to provide a limiting instruction that Dr. Urquiza's testimony should not be used as proof that sexual abuse actually occurred. Defendant acknowledges that there is a split in authority, with the majority of

cases holding the trial court has no such sua sponte duty and only one case holding the contrary. (*Mateo, supra*, 243 Cal.App.4th at pp. 1073-1074; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 736; & *People v. Stark* (1989) 213 Cal.App.3d 107, 116 [instruction required only on request]; see also *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088, fn. 5; *id.* at pp. 1090-1091 (conc. opn. of Baxter, J.); *id.* at p. 1100 (conc. opn. of Brown, J.) [a limiting instruction on battered woman syndrome is required only on request]; but see *Housley, supra*, 6 Cal.App.4th at pp. 958-959 [finding a sua sponte duty to give an instruction similar to CALCRIM No. 1193].)

Generally, absent a request by the defendant, a trial court has no sua sponte duty to give a limiting instruction. (*People v. Smith* (2007) 40 Cal.4th 483, 516.) However, in *Housley, supra*, 6 Cal.App.4th 947, the appellate court found that because of the potential misuse of CSAAS evidence and the resulting prejudice to the defendant, in all cases in which an expert is called to testify regarding CSAAS, the trial court had a sua sponte duty to instruct that "(1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true."[7] (*Housley*, at pp. 958-959.) The *Housley* court reasoned special precautions must be taken to ensure the jury does not accord an expert's opinion undue weight. A jury may readily accept the CSAAS expert testimony because it is beyond the jury's expertise. (*Id.* at pp. 957-958.) According to the court, CSAAS evidence is unusually susceptible of being misunderstood and misapplied by a jury, "perhaps because the expert commonly is asked to offer an opinion on whether the victim's behavior was typical of abuse victims, an issue closely related to the ultimate question of whether abuse actually occurred." (*Id*. at p. 958.)

---

**7**     This language is consistent with the language in CALCRIM No. 1193.

However, the court in *Housley* found the error in failing to instruct sua sponte harmless. The court noted the expert witness "twice told the jury she had not met the victim and had no knowledge of the case. Her testimony was couched in general terms, and described behavior common to abused victims as a class, rather than any individual victim." (*Housley, supra*, 6 Cal.App.4th at p. 959.) The court found it unlikely that the jury interpreted the expert's statements as supporting the victim's credibility. Therefore, it was not reasonably probable the defendant would have received a more favorable verdict if the limiting instruction had been given. (*Ibid*.)

CALCRIM No. 1193, introduced post-*Housley*, states, in part, "testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her) [or any conduct or crime[s] with which (he/she) was not charged]. [¶] You may consider this evidence only in deciding whether or not <insert name of alleged victim of abuse> conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

The commentary for CALCRIM No. 1193 acknowledges that the jurors must understand that the research on CSAAS assumes a molestation occurred and seeks to describe and explain children's common reactions to the experience but also warns that it is unnecessary and potentially misleading to instruct that the expert testimony assumes that a molestation has in fact occurred. (Judicial Counsel of Cal., Crim. Jury Instns. (2002) Commentary to CALCRIM No. 1193, pp. 952-953, citing *People v. Bowker, supra*, 203 Cal.App.3d at p. 394.) In fact, many of the post-*Housley* cases involve a challenge to the use of CALCRIM No. 1193 on the basis that it reduces the prosecution's burden of proof because it " 'effectively instructs the jury that they may take [Urquiza's] testimony as evidence of the defendant's guilt.' " (*Munch, supra*, 52 Cal.App.5th at p. 474; see also *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504.) These challenges have been routinely rejected. One such post-*Housley* case explained that *Housley* was

38

inconsistent with *People v. Humphrey, supra*, 13 Cal.4th 1073, which held that a limiting instruction on the use of battered women's syndrome need only be given on request. (*Mateo, supra*, 243 Cal.App.4th at p. 1073.) The *Mateo* court reasoned that both syndromes explain that victims' " 'seemingly self-impeaching' " behaviors—e.g., delayed disclosure, returning to the home—are consistent with their claims of having been beaten, raped, or sexually molested and could think of no reason why a duty to instruct should be imposed in one situation and not the other. (See *People v. Brown* (2004) 33 Cal.4th 892, 906; *McAlpin, supra*, 53 Cal.3d at pp. 1300-1301.) We agree. Because the use of CALCRIM No. 1193 is not without controversy and the majority of authority supports the conclusion that there is no sua sponte duty to provide it, we conclude the trial court did not err in failing to instruct the jury consistent with it.

Nor do we agree that defense counsel was ineffective for failing to request CALCRIM No. 1193 or an instruction with similar limiting language. Again, the record discloses that defense counsel likely had a rational tactical purpose for failing to request the limiting instruction. (See *Mai, supra*, 57 Cal.4th at p. 1009 ["a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance"].) During the jury instruction conference, defense counsel identified instructions "in line with [his] motions in limine" as CALCRIM Nos. 332 and 333. Those instructions were given upon his request. Given criticisms that CALCRIM No. 1193 may lessen the burden of proof for the prosecution and help guide the jury to a guilty verdict, the presumption that defense counsel acted strategically in failing to request this instruction is reasonable. Indeed, a reasonable juror could understand CALCRIM No. 1193 to mean that the jury can use Dr. Urquiza's testimony to conclude that J.E.'s behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use Dr. Urquiza's testimony to conclude J.E. was, in fact, molested. As the CSAAS evidence effectively neutralizes the victim's apparently self-impeaching behavior, under CALCRIM No. 1193, a juror who

39

believes Dr. Urquiza's testimony could find that J.E.'s apparently self-impeaching behavior does not affect her believability one way or the other. Defense counsel's strategy was inconsistent with this; he sought to have the jury believe J.E. lied when she made the initial abuse allegation and to believe her testimony that defendant did not engage in any sexually inappropriate behavior. Thus, defense counsel's failure to request the court to instruct the jury on CALCRIM No. 1193, reasonably appears to be strategical and defendant fails to convince that counsel's performance was deficient.

## IV

### *Cumulative Error*

Defendant contends that the judgment should be reversed based on the cumulative prejudice of the court's errors. However, we have determined that there was no error, so no prejudice could accumulate. (*People v. Vargas* (2020) 9 Cal.5th 793, 839.)

## DISPOSITION

The judgment is affirmed.

_____/s/_____
EARL, J.

We concur:

_____/s/_____
ROBIE, Acting P. J.

_____/s/_____
MAURO, J.

40